

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

ENTERED
03/18/2015

| | | |
|---|---|---|
| IN RE: | § | |
| **ROBERT LOUIS VAN EREM III,** *et al* | § | **CASE NO: 14-35191** |
| Debtor(s) | § | |
| | § | **CHAPTER  7** |

## MEMORANDUM OPINION

Following a factually intensive inquiry, the Court concludes that the funds utilized to purchase the Van Erem's home in Katy, Texas were not used with the intent to hinder, delay or defraud any creditor. *See* 11 U.S.C. § 522(o). Accordingly, the unlimited homestead exemption allowed under Texas law survives a challenge by the Trustee.

### Section 522(o)

Section 522(o) was adopted as part of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005. The effect of § 522(o) is to limit the amount of a homestead exemption that a debtor may claim under § 522(b)(3)(A). Under § 522(b)(3)(A), a debtor may ordinarily claim a homestead as exempt in accordance with the laws of the state in which the debtors reside. In this case, Texas law is applicable. In Texas, there is no limit on the value that may be claimed as exempt in a homestead. Tex. Prop. Code § 41.001.

The Van Erems elected the Texas homestead exemption when they filed their Amended Schedule C on September 22, 2014.

No party challenges whether the Texas exemption was properly claimed.

However, federal law, through § 522(o), limits the *amount* of the homestead exemption by reducing the exemption claim

> **… to the extent that such value is attributable to any portion of any property that the debtor disposed of in the 10-year period ending on the date of the filing of the petition with the intent to**

> **hinder, delay, or defraud a creditor and that the debtor could not exempt, or that portion that the debtor could not exempt, under subsection (b), if on such date the debtor had held the property so disposed of.**

11 U.S.C. § 522(o).

Because the reduction is framed with the introductory clause that requires a reduction "to the extent" of the misused funds, the Court must analyze whether any of the funds were spent with the requisite, wrongful intent. If they were, then the homestead exemption must be reduced, but only by the amount of the wrongfully spent funds. *In re Addison,* 540 F. 3d 805, 811 (8th Cir. 2008).

The party objecting to an exemption in bankruptcy has the burden of proving by a preponderance of the evidence that the exemption is improper. *In re Cipolla,* 476 F. App'x 301, 305 (5th Cir. 2012).

A number of principles guide the Court's application of § 522(o) to the facts of this case.

First, the Court's decision is based on the language of § 522(o) and not on general principles of equity or fairness. *Law v. Siegel,* 134 S.Ct. 1188 (2014). Under *Siegel,* the Court should carefully follow the exemption provisions of § 522 and neither expand nor contract its provisions under a general sense of fairness.

Second, § 522(o) "is intended to 'strike a balance between the rights of debtors and creditors in states with unlimited homestead exemptions such as Texas' and to make clear that 'abusive pre-bankruptcy planning will not be tolerated at the expense of creditors.' *In re Cipolla[1],* 476 Fed. Appx. 301 (5th Cir. 2012), *quoting In re Fehmel,* No. 07–60831, 2008 WL 2151797, at 6 (Bankr. W.D. Tex. May 22, 2008), *aff'd,* 372 Fed. Appx. 507 (5th Cir.2010).

---

[1] *Cipolla* is an unpublished decision from the Fifth Circuit Court of Appeals. The legal analysis in *Cipolla* closely reflects the analysis in the Eighth Circuit's decision in *In re Addison,* 540 F. 3d 805 (8th Cir. 2008). These are the only two Circuit court decisions that have directly interpreted § 522(o). Although the Court is bound by neither an

Third, § 522(o) should not be applied merely because there was a pre-petition conversion of non-exempt property to exempt property. Instead, there must be an actual intent to hinder, delay or defraud creditors. This actual intent may be inferred from circumstantial evidence. *In re Cipolla,* 476 Fed. Appx. 301, 306 (5th Cir. 2012). "Before actual fraudulent intent can be found there must appear in evidence some facts or circumstances which are extrinsic to the mere facts of conversion of non-exempt assets into exempt and which are indicative of such fraudulent purpose." *In re Addison,* 540 F. 3d 805, 813 (8th Cir. 2008).

Fourth, the Court should utilize the non-exhaustive badges of fraud contained in the Uniform Fraudulent Transfer Act in determining intent. *In re Addison,* 540 F. 3d 805, 811-12 (8th Cir. 2008); *In re Cipolla,* 476 Fed. Appx. 301, 307 (5th Cir. 2012). Because of the factual underpinnings of this case, the Court will explain the facts in detail. A separate analysis of the badges of fraud follows.

Fifth, the Court may not impute knowledge of Texas's liberal homestead allowance solely based on an individual's sophistication or education. For example, the fact that an individual is an attorney licensed to practice in Texas is insufficient to impute knowledge of Texas's liberal homestead protections. *In re Cipolla,* 476 Fed. Appx. 301, 308 (5th Cir. 2012).

### The Signing Bonus

Most of the dispute between the parties is centered on Mr. Van Erem's former employment with U.S. Bancorp Investments, Inc. Although the facts concerning his employment are in dispute, none of the disputed facts bear on the issue of whether the Van Erems' Texas homestead exemption should be limited.

---

unpublished decision of the Fifth Circuit nor a published decision of the Eight Circuit, the Court adopts the reasoning set forth in these two very thoughtful opinions.

Mr. Van Erem was induced to join U.S. Bancorp, in New Mexico, with a $597,073.00 signing bonus. Net of taxes, Van Erem actually received $405,418.84. Van Erem was obliged to repay all or a portion of the signing bonus if he left U.S. Bancorp within three years. Van Erem left U.S. Bancorp after 53 weeks of employment. Under the terms of his agreement, Van Erem was obligated to repay $398,048.67 to U.S. Bancorp.

It is unambiguous from the testimony that Mr. Van Erem left U.S. Bancorp with very hard feelings towards the company. He believed that U.S. Bancorp had induced him to join as an employee by misrepresenting material facts about the employment. He believed that U.S. Bancorp had failed to honor its promises to him. He was angry at U.S. Bancorp when he left. The Court has considered whether this anger influenced any intent to hinder, delay or defraud U.S. Bancorp.

Prior to leaving U.S. Bancorp, Mr. Van Erem consulted with several lawyers concerning his dispute with U.S. Bancorp. Although there is no direct testimony regarding those privileged conversations, Mr. Van Erem was confronting a series of legal problems: Should he file a suit or arbitration against U.S. Bancorp for having induced him to join the Bank under false pretenses? Should he file a breach of contract claim against U.S. Bancorp? How would he defend against a claim made by U.S. Bancorp to repay the $398,047.67? If he lost to U.S. Bancorp, what would be the consequences to his family?

Mr. Van Erem is sophisticated in financial matters. It would surprise the Court if these and other legal matters were not discussed with counsel. Such discussions were both necessary and appropriate. Consequently, and in light of the cautions in *Cipollo*, based on Mr. Van Erem's testimony, the Court concludes that he thoroughly considered his legal options. The Court

concludes that Mr. Van Erem was aware of Texas exemption laws when he moved to Texas. However, the Court does not find that Mr. Van Erem moved to Texas *because* of those laws.

Through an arbitration proceeding, Mr. Van Erem challenged whether he was obligated to repay the $398,048.70. In April, 2014, Mr. Van Erem lost the arbitration. Under the arbitration award, Mr. Van Erem was required to pay U.S. Bancorp $473,475.00, including filing and attorneys' fees. Mr. Van Erem paid none of the award.

The Court notes that allegations have been made that Mr. Van Erem had a duty to U.S. Bancorp to retain the signing bonus until his contingent repayment obligation had terminated. Nothing in the documents (or in logic) supports this allegation. The documents pay the funds to Mr. Van Erem, for use without any restrictions. Mr. Van Erem's federal income taxes were paid by withholding by U.S. Bancorp based on 100% of the funds when the funds were paid to Mr. Van Erem. If U.S. Bancorp had intended to retain control of the funds, the signing bonus could have been awarded annually as Mr. Van Erem's repayment obligations terminated. By paying 100% of the money up front, and without restriction, U.S. Bancorp lost all right to control the disposition of the funds.

If U.S. Bancorp had an ownership or security interest in the funds, the mere use of the funds would be evidence of an intent to defraud U.S. Bancorp. U.S. Bancorp had no such interest in the funds. Accordingly, the Trustee must demonstrate far more than the mere use of the funds to demonstrate that the Van Erems spent the funds with intent to hinder, delay or defraud a creditor.

### How the Funds Were Used

The Court heard extensive testimony on how the funds were used. Much of the testimony concerned funds that were spent on luxury expenses such as gambling trips to Las

Vegas, golfing, spas, and other expenditures of which the Court might disapprove. However, the test in the statute isn't whether the funds were spent in the manner that a particular judge might approve, or even in a manner that is reasonable.

The Van Erems were a high income family, living in a prosperous community, and had extremely high (perhaps even unrealistic) income expectations. Those expectations were fostered by the new job with U.S. Bancorp, and the receipt of a $600,000.00 bonus. Even under those financial circumstances, the Court might wish that the Van Erems had been responsible savers, and had foregone their luxury purchases. But, under those circumstances, the mere purchases of luxury goods fails to trigger a presumption of any intent to "hinder, delay, or defraud" a creditor.

However, these luxury purchases continued until a time when they were irresponsible by any measure. By the summer of 2012, the Van Erems knew that the employment arrangement with U.S. Bancorp had failed. Nevertheless, they continued to incur large gambling losses at least throughout the summer of 2012. Although no precise total is available, the Van Erems probably spent over $10,000.00 during the summer of 2012 on gambling and luxury goods.

Although this conduct was irresponsible, it was done to satisfy immature impulses. The Van Erems had engaged in this type of conduct before the summer of 2012, and continued the irresponsible conduct thereafter. Because this was continuing conduct, the Court cannot attribute any intent to hinder, delay and defraud creditors. There was still no arbitration award against the Van Erems, the money was theirs to fritter away as they pleased, and there is an absence of evidence that they intended to hinder, delay or defraud any creditor by their conduct. Nevertheless, the Court will consider this conduct in considering the badges of fraud below.

Mr. Van Erem received the net $405,000.00 signing bonus in September, 2011 when he began his employment with U.S. Bancorp. He left immediately after his one-year anniversary to accept employment with Chase Bank in Houston, Texas. By at least July, 2012, the Van Erem family had decided to relocate to Texas.

The Van Erems sold their home in New Mexico, but received no net proceeds from the sale. Indeed, when the home was sold, they were forced to pay $7,841.09 in order to pay their existing mortgage loan. The home, located in Rio Rancho, New Mexico, sold on October 30, 2012 for a gross sales price of $389,800.00. Trustee Ex. 12.

The Van Erems purchased a replacement home in Katy, Texas on about September 17, 2012 for a gross sales price of $539,000.00. To finance the purchase, they borrowed $417,000.00. Trustee Ex. 13. The Van Erems paid $112,589.12 as a down payment, and spent additional funds to improve and furnish the Katy home.

There are key, undisputed financial facts starting with the receipt of the bonus and ending with the month prior to the commencement of the bankruptcy case. Those are contained in the chart attached as Exhibit "A". The Court concludes the following from the data within Exhibit "A":

- During all relevant time periods, the Van Erems were spending more per month than the family's monthly after tax income.

- The Van Erems spent large amounts of money defending and prosecuting the arbitration with U.S. Bancorp.

- To finance their ongoing spending habits and litigation, the Van Erems spent the proceeds of the U.S. Bancorp advance, the proceeds of the sale of investments, and proceeds received from the early withdrawal of funds from retirement accounts.

- The Van Erems did not dissipate substantially all of their non-exempt property when they purchased the Texas home.

**Chase Bank Account**

Prior to the family's move to Houston, Ms. Van Erem opened an account only in her name at Chase Bank in September of 2012. The funds were used for payment of the family's expenses. Except as noted, the balances on Exhibit "A" include the balances in the Chase account. When the bankruptcy petition was filed in September of 2014, it was filed as a joint petition. Any remaining non-exempt funds transferred to the Chase account became estate property.

The Van Erems testified that the Chase account was opened in her name for convenience. She was moving to Houston, with their son, before her husband.

Although the trustee implies that the creation of an account in Houston in only Ms. Van Erem's name was nefarious, the Court found the testimony of the Van Erems credible on this issue. There was a complete absence of evidence to indicate that the funds were inappropriately dissipated. Moreover, under Texas law, it is irrelevant that the funds were placed in an account only in Ms. Van Efren's name.

U.S. Bancorp and the Trustee imply that placing the funds in an account in Ms. Van Erem's name would have made the account Ms. Van Erem's sole management community property. However, there is no evidence to suggest that the Van Erems ever asserted this position. Indeed, as set forth on Exhibit "A", the Van Erems utilized over $175,000.00 in transfers from their exempt IRA accounts to pay their ongoing obligations. It seems highly unlikely that the account in Ms. Van Erem's name was part of any scheme to defraud U.S. Bancorp.

Mr. Van Erem's rights in the funds were not dissipated. The Court does not understand how the property could have conceivably been considered Ms. Van Erem's sole management

community property.  Absent a written agreement under § 3.102(c) of the Texas Family Code (not present here), Ms. Van Erem's sole management community property would not normally include Mr. Van Erem's earnings.  Tex. Fam. Code § 3.102(a).  More precisely, even if the bank account was her sole management community property, funds transferred into the bank account that were the proceeds of Mr. Van Erem's earnings would be liable for Mr. Van Erem's debts. Tex. Fam. Code § 3.102(b); *See also Brooks v. Sherry Lane Nat. Bank*, 788 S.W.2d 874, 876 (Tex. App. 1990) ("When special community property combines with the other spouse's special community property, the resulting mix constitutes joint community property."). Inasmuch as the Court has determined that the Van Erems *understood* Texas exemption laws after consulting with counsel, it will not assume that the Van Erems *misunderstood* Texas exemption laws so as to impute bad conduct by them.

With one exception noted below (see Proposed Settlement with U.S. Bancorp), there is a complete absence of evidence that the creation of the Houston account was nefarious.

Moreover, § 522(o) requires that a transfer also be a disposition.  The transfer from one account owned by a debtor in this case to another account owned by a debtor in this case did not result in any net disposition.  The Court will not grant any § 522(o) relief based on the intrafamilial transfers to the Chase account.

### Proposed Settlement with US Bancorp

After the arbitration award was issued against Mr. Van Erem, he engaged in settlement negotiations with U.S. Bancorp.  In those negotiations in May, 2014, Mr. Van Erem told U.S. Bancorp that the maximum that he could afford to pay as a down payment on any settlement was $31,500.00.  To document that inability, he included only a copy of the joint checking account. Trustee Ex. 21.  Had he included the account that was solely in Ms. Van Erem's name, the

account would have reflected a substantially greater ability to pay the debt.  To understand the issue, one needs to understand the structure of the account statements.  The funds transferred from the couple's joint account in New Mexico to the Chase account in Houston were maintained in a checking and a savings account.  Ms. Van Erem also opened a retirement account at Chase Bank that held her exempt retirement funds.  These retirement funds exceeded $200,000.00. Had the account statement been provided to U.S. Bancorp, it would have shown small amounts in the checking and savings account, and a large amount in Ms. Van Erem's retirement account.  To preserve his negotiating leverage, Mr. Van Erem did not want to expose the large cash balance in the retirement account to U.S. Bancorp.

U.S. Bancorp did not accept the settlement offer.  Accordingly, any misrepresentation made by Mr. Van Erem appears to have caused no harm.  However, this sleight of hand by Mr. Van Erem is some evidence that he was willing to mislead U.S. Bancorp rather than to repay them.

### The Down Payment

As set forth above, the Van Erems sold a house in New Mexico for $389,800.00 and purchased a home in Texas for $539,000.00.  In order to avoid paying for private mortgage insurance, the Van Erems decided that they would make a 20% (approximately) down payment on the home.  The Court accepts this testimony as establishing the reason for a 20% down payment.

The Court further accepts that Mr. Van Erem moved to Texas to obtain employment, not to hinder, delay or defraud his creditors.  Finally, the testimony is uncontested that the Van Erem family is a closely-knit family.  The primary concern that the Van Erems had about the move to

Texas was to assure stability for their teenage son. They wanted to assure that the family lived in a traditional single family home, with a stable family and school life for their son.

One issue for the Court is whether the Van Erems purchased a more expensive house in Texas as an "insurance policy" against a possible litigation loss to U.S. Bancorp. If so, did that exemption strategy run afoul of *In re Addison,* 540 F. 3d 805, 811-12 (8th Cir. 2008); *In re Cipolla,* 476 Fed. Appx. 301, 307 (5th Cir. 2012)?

A 20% down payment on the Texas home would have been $107,800.00. Closing costs payable by the Van Erems were $10,616.36. The total paid by them at the closing was $122,589.21, or about $4,000.00 more than a 20% down payment. This discrepancy largely reflects that the Van Erems actually paid a larger than 20% down payment on the home, with their mortgage financing only 77.4% of the purchase price.

If the Van Erems had purchased a Texas home for $389,800.00 (the same price as their New Mexico home), with a 20% down payment and pro-rated closing costs, they would have spent only $85,637.66 on a down payment and closing costs.

Accordingly, by purchasing a more expensive home with a slightly larger down payment, the Van Erems spent an additional $36,951.55 over having purchased a home with an equivalent price.

The Court has considered this additional expenditure when evaluating the badges of fraud and in light of *Addison* and *Cipolla*. Although the Court has concluded that the additional $36,951.55 was spent to protect the funds by utilizing Texas's beneficial homestead laws, this type of exemption planning was insufficient to invoke the "hinder, delay or defraud" requirement of § 522(o). For the purposes of completeness, if the Court has erred with respect to whether

the Van Erems intended to hinder, delay, or defraud a creditor, the Court finds that the proper reduction in the homestead exemption would be $36,951.55.

## The Badges of Fraud

The Court must now apply the facts of the case to the badges of fraud ordinarily utilized for determining whether a fraudulent transfer has occurred. The badges of fraud require a Court to evaluate whether:

1. the transfer or obligation was to an insider;

2. the debtor retained possession or control of the property transferred after the transfer;

3. the transfer or obligation was concealed;

4. before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

5. the transfer was of substantially all the debtor's assets;

6. the debtor absconded;

7. the debtor removed or concealed assets;

8. the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

9. the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

10. the transfer occurred shortly before or shortly after a substantial debt was incurred; and

11. the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

Tex. Bus. & Com. Code § 24.005(b).

**Was the transfer or obligation to an insider?**

Whenever there has been a conversion of non-exempt to exempt property, this badge has been satisfied. The transfer in this case was to the Van Erems' exempt property. This badge favors the Trustee.

**Did the debtors retain possession or control of the property transferred after the transfer?**

Whenever there has been a conversion of non-exempt to exempt property, this badge has been satisfied. By the nature of such a transfer, the Van Erems retained the homestead. This badge favors the Trustee.

**Was the transfer or obligation concealed?**

There was no concealment of the purchase of the Texas homestead, or of the amount of the mortgage, or the down payment. The Van Erems moved to Texas, and did not attempt in any manner to hide the purchase of the home. Although there is no evidence that they disclosed the precise amount of the down payment on the home, there is also no evidence that the Debtors concealed the amount of the down payment. This badge favors the Van Erems.

**Before the transfer was made or obligation was incurred, had the debtor been sued or threatened with suit?**

No suit had been filed before the date of the transfer. The Court notes that the Debtors were aware that they planned to trigger the repayment provisions of the contract, but also believed that there were valid defenses. However, there is no evidence that U.S. Bancorp ever threatened to sue Van Erem before the date of the transfer. This badge is more appropriately considered as an insolvency issue. This factor slightly favors the Van Erems.

**Was the transfer of substantially all the debtor's assets?**

The down payment was material, but left the Van Erems with over $90,000.00 in unencumbered, non-exempt cash after the home was purchased. Moreover, the Van Erems

freely transferred exempt cash into their non-exempt account after the transfer. If the exempt cash is counted, there were substantially more assets. By any measure, this badge favors the Van Erems.

**Did the debtors abscond?**

The Van Erems openly moved to Texas. They did not abscond. This badge favors the Van Erems.

**Did the debtor remove or conceal assets?**

The Van Erems did not remove or conceal assets at the time of the transfer. Subsequently, Mr. Van Erem was not forthright about Ms. Van Erem's account in Houston. This absence of forthrightness occurred at the time of the settlement negotiations. This badge slightly favors the Trustee.

**Was the value of the consideration received by the debtor reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred?**

This factor is the inverse of the first two factors. When property is merely moved between non-exempt and exempt status, there is rarely an "equivalent value" issue. This badge favors the Van Erems.

**Was the debtor insolvent or become insolvent shortly after the transfer was made or the obligation was incurred?**

Although the arbitration award was not issued against the Debtors until 2014, the Debtors became insolvent at the moment when Mr. Van Erem left USB's employment in 2012. In retrospect, that was the moment when he incurred a $400,000.00 repayment obligation. Accordingly, the Van Erems were insolvent at the time the transfer was made and remained insolvent after such transfer occurred. This factor favors the Trustee.

**Did the transfer occur shortly before or shortly after a substantial debt was incurred?**

The contingent debt was incurred with the signing of the original contract with US Bancorp. The US Bancorp agreement contains contradictory clauses concerning the accrual of the repayment obligation. Paragraph 2 (the paragraph dealing with a departure after 12 months of employment) provides that upon departure after 1 month and before 24 months Van Erem "agree[s] to repay to USBI two-thirds (2/3) of the Advance paid...." However, the final paragraph of that same agreement contains a statement that "under no circumstances will the cash advance be considered earned unless and until you have been employed with USBI for 36 months...." However, Van Erem's departure triggered the condition requiring repayment. This factor is largely subsumed in the prior factor concerning insolvency. Accordingly, this badge slightly favors the Trustee.

**Did the debtor transfer the essential assets of a business to a lienor who transferred the assets to an insider of the debtor?**

This did not occur. This factor favors the Van Erems.

Based on the foregoing, the Court finds that five factors favor the Trustee. Six factors favor the Van Erems. Although the badges of fraud are a non-exhaustive list, the Court finds them helpful. The luxury goods and gambling expenditures made by the Van Erems *after* they encountered severe financial stress should be counted as an additional factor against the Van Erems. The fact that the Debtors converted exempt property into non-exempt accounts after the transfer is a factor that favors the Van Erems. Adding those factors still leaves the numerical count in favor of the Van Erems.

Of course, the determination is not purely numeric. In weighing the factors, the Court also considered the following:

- Two of the badges of fraud present in this case—(i) the transfer was made to an insider and (ii) the debtor retained possession and control—are present anytime there has been a conversion of non-exempt property to exempt property.

- Two of the badges of fraud present in this case overlap. The substantial debt that was incurred—the $400,000.00 repayment obligation–is what caused the Van Erems' insolvency. The insolvency badge analysis subsumes the "substantial debt" analysis.

- The Debtors' concealing of Ms. Van Erem's account in Houston occurred in May of 2014, approximately twenty months after the disputed transfer.

- In *Cipolla*, the Fifth Circuit engaged in the same badges of fraud analysis and found that five of the factors were present, but ultimately vacated the bankruptcy court's finding of an intent to defraud.  In *Cipolla*, a chapter 7 debtor disposed of part of his equity in a Missouri property (where the bulk of the value of the property was non-exempt), by obtaining a $76,000.00 home equity loan and subsequently applying those funds toward a non-exempt asset—the Texas Property.  The TUFTA badges present in that case included: (1) the transfer occurred shortly before the debtor incurred substantial debt, (2) the debtor was sued or threatened with suit before the transfer, (3) the debtor transferred property to an insider, (4) the debtor retained the use of the Missouri property, and (5) the transfer involved all or substantially all of the debtor's assets.  Additionally, the bankruptcy court presumed that the Debtor had knowledge of State homestead exemptions because he was a licensed attorney in Texas and Missouri. *In re Cipolla*, 476 F. App'x 301, 308 (5th Cir. 2012). While acknowledging that these badges were present, the Fifth Circuit remanded the case based solely on the finding that the debtor was "presumed to have knowledge of State homestead exemptions." *In re Cipolla*, 476 F.

App'x 301, 308 (5th Cir. 2012). The Fifth Circuit found that this erroneous finding was not harmless error, holding that the presence of these five badges of fraud would not always be sufficient for finding an intent to hinder, delay, or defraud.

### Conclusion

The Court's decision is not obvious. As set forth above, the Court is critical of some of the Van Erems' conduct. Although the purchase of the home was made approximately two years before the commencement of this bankruptcy case, it was made contemporaneously with the realization of a $400,000.00 repayment obligation to U.S. Bancorp. And, the "look-back" period in the statute is ten years.

The Court is guided by the two Circuit Court decisions that provide detailed guidance in this matter. *In re Addison,* 540 F. 3d 805 (8th Cir. 2008); *In re Cipolla,* 476 Fed. Appx. 301 (5th Cir. 2012). The instruction from those cases is clear. Debtors may plan their investments in exempt property to maximize their allowed exemptions. They may do so even in the face of insolvency. They may not do so with the intent to "hinder, delay or defraud" a creditor.

Having fully considered the badges of fraud, the facts of the case, the credibility of the witnesses, and the applicable law, the Court concludes that the Van Erems did not act with the intent of hindering, delaying or defrauding a creditor.

The Van Erems' exemptions, as claimed on their Amended Schedule C, are allowed.

SIGNED **March 18, 2015.**

Marvin Isgur
UNITED STATES BANKRUPTCY JUDGE

EXHIBIT "A"

# August, 2011 - August, 2014

# Summary of Transactions

Transfers out of Exempt Retirement Accounts      $176,032.36
Payments of arbitration attorneys      $40,470.75
Purchase of home      $136,513.00

# SIGNIFICANT OUT OF THE ORDINARY COURSE TRANSACTIONS

| MONTH | DESCRIPTION | AMOUNT |
|---|---|---|
| March, 2012 | Transferred from investments into checking | $40,000.00 |
| May, 2012 | Purchased Facebook stock | $20,026.79 |
| | Deposited into checking (source not in record) | $43,000.00 |
| July, 2012 | Transferred from exempt retirement funds into checking | $50,000.00 |
| | Down payment paid on home in Katy, Texas | $10,000.00 |
| | Deposited into checking (source not in record) | $20,227.69 |
| September, 2012 | Transfer between checking accounts | $50,000.00 |
| | Transferred from exempt retirement funds into checking | $19,717.86 |
| | Intrafamily transfer to Houston account | $55,100.00 |
| | Intrafamily transfer to Houston account | $19,000.00 |
| | Purchase of Katy, Texas home | $112,589.21 |
| October, 2012 | Out of pocket payment for sale of New Mexico home | $7,884.00 |
| | Payment on AMEX bill | $19,632.57 |
| November, 2012 | Transfer between checking accounts | $10,000.00 |
| | Deposit into checking (source not in record, but from a U.S. Bancorp Account) | $10,706.59 |
| | Purchase for surround sound for Katy, Texas home | $2,321.69 |
| | Purchase of appliances for Katy, Texas home | $4,634.95 |
| | Purchase of appliances for Katy, Texas home | $4,800.00 |
| | Purchase of appliances for Katy, Texas home | $2,167.15 |
| January, 2013 | Transferred from exempt retirement funds into checking | $25,000.00 |
| | Payment to arbitration attorneys | $10,000.00 |
| | Ms. Van Erem moves her retirement account to Chase in Houston | $243,735.00 |
| February, 2013 | Payment to arbitration attorneys | $5,761.75 |
| March, 2013 | Intrafamily transfer to Houston account | $10,000.00 |

| | | |
|---|---|---|
| June, 2013 | Transferred from exempt retirement funds into checking | $5,250.00 |
| | Intrafamily transfer to Houston account | $3,000.00 |
| | Payment to arbitration attorneys | $2,709.00 |
| July, 2013 | Intrafamily transfer to Houston accountr | $4,000.00 |
| August, 2013 | Transferred from exempt retirement funds into checking | $3,500.00 |
| | Intrafamily transfer to Houston account | $4,200.00 |
| | Intrafamily transfer to Houston account | $3,500.00 |
| September, 2013 | Transferred from exempt retirement funds into checking | $8,264.50 |
| October, 2013 | Intrafamily tranfser to Houston account | $2,000.00 |
| | Transferred from exempt retirement funds into checking | $5,000.00 |
| | Intrafamily tranfser to Houston account | $4,000.00 |
| | Intrafamily tranfser to Houston account | $3,356.96 |
| November, 2013 | Transferred from exempt retirement funds into checking | $3,000.00 |
| | Intrafamily transfer to Houston account | $2,000.00 |
| December, 2013 | Intrafamily transfer to Houston account | $1,500.00 |
| January, 2014 | Transferred from exempt retirement funds into checking | $12,500.00 |
| | Payment to arbitration attorneys | $10,000.00 |
| | Intrafamily transfer to Houston account | $1,300.00 |
| February, 2014 | Transferred from exempt retirement funds into checking | $3,800.00 |
| | Intrafamily transfer to Houston account | $900.00 |
| | Salary bonus deposuted from new employment | $27,416.68 |
| March, 2014 | Intrafamily transfer to Houston account | $7,500.00 |
| | Deposited into checking (source not in record) | $19,229.30 |
| | Payment to arbitration attorneys | $12,000.00 |
| June, 2014 | Cash advance received on credit card | $2,000.00 |
| | Tax refund received and deposited | $3,213.00 |
| | Intrafamily transfer to Houston account | $1,400.00 |

# August, 2011 - August, 2014

# Summary of Checking Account Balances

| Month | Sum of Balances Shown on Statement for this Month** | Notes |
|---|---|---|
| August-11 | $25,883.38 | |
| September-11 | $406,370.94 | Bonus received from U.S. Bankcorp |
| October-11 | n/a | |
| November-11 | n/a | |
| December-11 | $278,728.40 | |
| January-12 | $255,508.06 | |
| February-12 | $243,376.52 | |
| March-12 | $259,420.52 | |
| April-12 | $244,643.14 | |
| May-12 | $188,659.38 | |
| June-12 | $173,811.03 | |
| July-12 | $213,860.90 | |
| August-12 | $197,874.30 | |
| September-12 | $92,472.06 | Katy, Texas home purchased. Repayment liability to U.S. Bank arises New Mexico home sold |
| October-12 | $50,996.21 | |
| November-12 | $55,431.55 | |
| December-12 | $40,617.89 | |
| January-13 | $45,995.28 | |
| February-13 | $38,132.24 | |
| March-13 * | $6,792.43 | |
| April-13 | $17,486.55 | |
| May-13 | $8,435.28 | |
| June-13 | $5,631.71 | |
| July-13 | $4,420.41 | |
| August-13 | $1,536.03 | |
| September-13 | $8,264.50 | |
| October-13 | $3,575.39 | |
| November-13 | $423.94 | |
| December-13 | $3,068.29 | |
| January-14 | $3,293.56 | |
| February-14 | $20,951.84 | |
| March-14 | $11,176.08 | |
| April-14 | $6,939.22 | Adverse arbitration award |
| May-14 | $5,453.60 | |
| June-14 | $5,731.14 | |
| July-14 | $1,408.80 | |
| August-14 | $4,646.14 | |
| September-14 | n/a | Bankruptcy filed |

\*   Ms. Van Efrem's Houston account bank statements are not in the record starting this month.

\*\* Not all statements have end of month closing balances.